VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      22-AP-186



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

MARCH TERM,   2023

Chelsea Griggs v. Christopher Griggs*     }     APPEALED FROM:
                                          }     Superior Court, Addison Unit,
                                          }     Family Division
                                          }     CASE NO. 20-DM-00837
                                                Trial Judge: Thomas Carlson

In the above-entitled cause, the Clerk will enter:

Father appeals from the family division's final divorce order, challenging its imposition of shared parental rights and responsibilities (PRR) regarding the parties' child and its division of property. We affirm in part and reverse and remand in part.

Following a five-day trial, the family division issued a final divorce decree including findings of fact and conclusions of law, which are summarized in relevant part as follows. The parties met in 2007 and jointly purchased land in 2008, where they built a home, both contributing cash and sweat equity. They married in 2010. Over the course of the next decade or so, the parties relocated several times and purchased and renovated various properties as part of a family plan to invest in real property. Mother filed this divorce action in December 2020.

At the time of trial, mother was residing in a home that she purchased in the fall of 2021 in Middlebury, Vermont. Since July of 2021, mother has worked full-time as the general manager of Cookie Love in North Ferrisburgh, Vermont, earning a salary of $50,000 per year plus a modest annual bonus. Mother previously worked as the owner and manager of the Inn on the Green, a business and property that the parties purchased together in 2018 and sold in 2021. Before that, she worked in administrative roles at schools as well as other jobs, which provided health insurance and childcare opportunities for the family. Throughout the marriage, mother worked together with father in improving and managing their rental properties.

Father is a licensed electrician and started his own electrical contracting business known as East View Electrical Services in 2010. He remains the sole owner and manager.

Father's electrical business was the largest asset in the marital estate. Each party hired an expert appraiser to analyze East View, and both testified as to their respective opinions of its value. Both experts used the capitalized-earnings approach to value the business. They separately calculated an annual net cash flow and analyzed the risks and expected growth rate for the business, ultimately arriving at an amount that each believed a reasonable investor would pay for it. Mother's expert arrived at a value of $719,000, and father's expert arrived at a value of $580,000. While the experts' respective calculations differed in minor ways, the most significant contrast was that mother's expert kept approximately $87,600 of Covid Paycheck Protection Program (PPP) funds in the business income for 2020, while father's expert removed them as a one-time windfall. The court found credible mother's expert's statement that currently valuation professionals tend to leave PPP income in because the intent of the PPP program was to replace lost income to encourage employers to keep employees on payroll during the Covid pandemic. The court noted that father's expert recognized that "reasonable experts could differ" on whether to count PPP funds. The court found mother's expert's testimony more convincing and adopted that expert's valuation of $719,000 for East View.

The parties' jointly owned real-estate portfolio and rental business comprised the other significant marital assets. When this proceeding began in 2021, the parties owned several properties together. One was a rental property located on West Shore Road on Lake Dunmore in the Town of Salisbury, consisting of three small residences. The parties purchased the Lake Dunmore property in June 2020, and gutted and renovated two of the units. and then rented out all three. Another property was a home located on Schoolhouse Road in Middlebury, where the parties lived together from 2019 until they separated in 2021. After separating, mother continued to live in this home while father moved into one of the three small homes on the Lake Dunmore property. The parties sold the Schoolhouse Road property in October 2021 and net proceeds of $231,891 were placed in escrow.

A third property was located on Lake Dunmore Road in Salisbury. The parties purchased this home with an accessory dwelling unit in 2017 for $385,000. They used it as their primary residence for some period and otherwise rented it out. They still owned it at the time of trial.

The parties purchased the Inn on the Green for $1,050,000 in 2018, and the down payment and cost of improvements came out of East View accounts. Mother managed the Inn while also taking on primary parenting duties, made possible by the flexible schedule of that work. The parties sold the Inn to Middlebury College in the fall of 2021 for $1,285,000. Accounting for the sale proceeds and related issues were the subject of disputes both in discovery and at trial, which are addressed in greater detail below. Ultimately, proceeds of $309,196 were placed in escrow along with $6500 refunded from a real estate commission.[1]

At the time of the final merits hearing, the parties' real-estate portfolio consisted of three properties: mother's home in Middlebury and the two Salisbury properties—Lake Dunmore Road and West Shore Road. Based on accounting evidence submitted by the parties and expert opinions, the court determined the remaining equity value of each property, totaling $616,000.

---

[1] By court order, $96,000 of the total escrowed funds were released to mother to purchase her home and to make equal cash distributions to each party of $11,034. This left a remaining total escrow balance of approximately $451,500.

The marital estate also included numerous accounts from the parties' various holding and rental companies, as well as retirement and checking accounts. The court found that these accounts contained a total remaining value of $379,412. The court did not attempt to calculate the value of operating accounts of East View. The court noted there was not clear testimony as to their current holdings, and the valuation experts both assumed that all business assets were necessary to generate the income that they used as the basis for their valuations. The court also noted that, based on both parties' testimony, the East View accounts, while ostensibly business accounts, were frequently intermingled with the parties' rental property cash flow, proceeds from real estate sales, payment of joint personal expenses, and father's sole personal expenses.

The court also found that mother used Inn business accounts for her own personal expenses to some extent. Despite intermingling of various business and personal accounts by both parties, the court found that neither party proved "to any degree of likelihood that the other party has hidden or diverted funds."

The court found that the parties' rental-property business and real-estate dealings were an equal joint effort of investment, improvement, maintenance, and management. It found that, overall, the parties contributed roughly equally toward the growth of the marital estate throughout the marriage. After considering the statutory factors, the court decided that an approximately equal split of the marital estate was equitable.

The court awarded father the West Shore Road property where he had been living, as well as the East View business. It awarded mother her home in Middlebury and the Lake Dunmore Road property. The court split one retirement account equally between the parties and awarded all remaining accounts to mother. As calculated by the court, father received $1,036,167 in assets while mother received assets worth $1,058,797.

The court further ordered the following accounting related to this division of property:

> Father shall account to mother for all rental income and expenses paid in association with 2086 Lake Dunmore Road in 2021 and 2022. He shall pay her one half of any net income in 2021 and the entire balance of any net income in 2022, in each case without regard for depreciation. Father shall also account to mother for all rental income and expenses paid in association with 272-310 West Shore Road in 2021 and 2022. He shall pay her one half of any net income in 2021, without regard to depreciation, and he shall be entitled to retain the balance of any net income in 2022. For purposes of determining net income on that property, the rental value of the unit father occupies shall be included at $1200 a month as if paid by a third party. Each party shall then be responsible for the ongoing expenses of the rental property awarded to them. The parties shall be equally liable for the 2020 and 2021 income tax liabilities on those two rental properties whether they file jointly or separately.

> Mother and a certified public accountant of her choice shall account to father as her accountant deems reasonabl[y] necessary

3

to determine the taxable income from operations and sale of the Inn on the Green in 2020 and 2021. The account balances determined herein are the last word on the net proceeds of those operations and sale. The parties shall be equally liable for the income tax burden of those operations and sale, whether they file jointly or separately.

The court also awarded father a disproportionate share of tangible personal property, including a tractor, tractor equipment and trailers, boats, and a motorcycle, to compensate for his slightly lower award of accounts and real property.

The parties have one minor child together. Mother was the primary caregiver throughout the marriage, which allowed father to work the long hours he needed to start and grow East View. The court found that father was also a consistently active and engaged parent. In March 2021, after this proceeding began, the parties filed a temporary agreement, setting forth a parent-child-contact schedule and providing, among other things, that they would share PRR. The agreement specifically stated that all terms were "for the temporary period of this divorce." The court approved this agreement and the parties operated under its terms for the duration of the case.

At trial, both parties sought sole PRR. The court found that although the parties had conflicts and some problems communicating, they "showed both an ability to communicate well and make joint decisions . . . even after they separated." It acknowledged the statutory prohibition against imposing shared legal rights and responsibilities where the parties cannot agree to share them, but it stated that "in this case they did agree to share them and the court concludes it would be in [the child's] best interests for them to continue to do so even if it poses a challenge sometimes." The court thus ordered the parties to share PRR.

On appeal, father claims that the court made several errors related to property division. He challenges the sufficiency or weight of evidence as to certain determinations, the adequacy of the court's findings and explanations related to particular aspects of its order, and evidentiary and discovery rulings. He also argues that the court ran afoul of 15 V.S.A. § 665(a) by ordering the parties to share legal PRR against their will. Mother supports the court's property division, but she agrees that the court's PRR order violates § 665(a) and requires reversal and remand.

"The family court has broad discretion in dividing marital property," and we will affirm its property division "unless its discretion was abused, withheld, or exercised on clearly untenable grounds." Kasser v. Kasser, 2006 VT 2, ¶ 30, 179 Vt. 259; see also Hayden v. Hayden, 2003 VT 97, ¶ 14, 176 Vt. 52 (explaining that family court's valuation conclusions will stand "as long as they are supported by adequate findings, which are in turn supported by sufficient evidence in the record" (quotation omitted)). "The division of marital property is not an exact science and, therefore, all that is required is that the distribution be equitable." Casavant v. Allen, 2016 VT 89, ¶ 15, 202 Vt. 606 (quotation omitted).

Father contends that the family court's finding as to the value of East View was clearly erroneous because the court's inclusion of PPP funds in the business's income was not supported by any evidence. Father argues that mother's expert's justification for including the PPP funds was not persuasive, and that it would only make sense to include PPP funds for 2020 if there was

4

loss of income in that year. Mother's expert explained that she included these funds not based on an overall loss of income, but because their purpose was to compensate for rent, payroll, utilities, and other expenses incurred when the business was forced to shut down during Covid. It is undisputed that East View shut down for a period in 2020 due to the pandemic, that East View kept all of its employees on payroll as required by the PPP program, and that the PPP loan was entirely forgiven and thus became part of the business's revenue for that year. Father's expert conceded that including PPP funds as part of the business valuation was a matter of professional judgment, and mother's expert testified that doing so was consistent with her training and continuing education as a professional appraiser. Mother's expert's valuation was clearly supported by record evidence and the family court was therefore entitled to adopt it. Hayden, 2003 VT 97, ¶ 14; see also Gravel v. Gravel, 2009 VT 77, ¶ 13, 186 Vt. 250 ("It was within the trial court's discretion to choose between the experts' opinions, and it did not abuse its discretion in making its choice."). We reject any contention about the persuasiveness or credibility of this evidence because we do not make those assessments anew on appeal. Mullin v. Phelps, 162 Vt. 250, 261 (1994) ("[O]ur role in reviewing findings of fact is not to reweigh evidence or to make findings of credibility de novo.").

Father relatedly argues that the court's determination regarding East View's valuation was influenced by improperly admitted statements introduced by mother's attorney. He recounts a segment of mother's attorney's cross-examination of father's expert in which mother's attorney asked father's expert to comment on a quote from another appraiser who was not testifying, regarding the propriety of including PPP funds in the valuation of a business. We need not decide whether this quote was or could have been properly admitted because there was no indication that the court relied on this particular exchange in its role as factfinder, and there was ample other evidence in the record, as discussed above, which supported the trial court's findings as to the valuation of East View. Thus, there was no showing of prejudice to warrant reversal even if the court made some evidentiary error. See In re S.B.L., 150 Vt. 294, 297 (1988) (recognizing that it is appellant's burden "to demonstrate how the lower court erred warranting reversal"); Vance v. Locke, 2022 VT 23, ¶ 16 (concluding that any error in admitting or discussing certain evidence was harmless where court did not rely on it to make findings of fact and "the court's findings were supported by other evidence in the record").

Father next contends that the family court did not support or explain several aspects of its property award. He asserts that the court should not have ordered father to pay mother part of the net income from rental properties for 2021 and 2022 because the rental properties were already apportioned to the parties and therefore "[b]y adding back the rents, the court made [father] pay [mother] twice for the same asset" and did so without justification. Similarly, he argues it was error to order him to pay rent for the property he was living in because mother was not ordered to pay rent for her home. We are unpersuaded by these contentions.

Property division is not an exact science, and here the family court's final decree includes a reasonable justification, based on its findings, for ordering father to pay these sums. This is all it was required to do. See MacCormack v. MacCormack, 2015 VT 64, ¶ 3, 199 Vt. 233 ("In reviewing a judgment from the trial court in a divorce proceeding, we look to whether the trial judge has adequately explained the underlying rationale for its decision, which we will not disturb absent a showing that the court abused its discretion." (quotation omitted)). The court concluded, and father does not contest, that the entire marital estate should be divided roughly equally. This roughly equal division necessarily includes proceeds from the parties' rental-

5

property business. The court found that, since at least the beginning of 2021, the bank account for the parties' rental business had been closed even though they continued to generate income from rentals. It found further that the income and expenses from rental properties "were thoroughly intermingled" with those of East View and father's sole expenses, and the parties did not provide the court with an accounting of rental income and expenses that would allow it to distinguish between net rental income and net income of East View. It explained that "[f]ather has made no secret of having moved a lot of money into East View"—particularly in 2021 after the parties separated—"and the court has taken that into consideration in its valuation of the company and in its property division conclusions." Because East View was valued based on its capitalization of earnings and there was no evidence of the business's account values, the court explained that it could not determine how much of the rental proceeds may have been commingled into East View's accounts. Given these circumstances, father's claims of double-counting are unfounded and it was well within the court's discretion to order father to pay mother her equal share of the net rental income for 2021 and 2022.

For the same reasons, the court did not abuse its discretion by requiring father to effectively pay rent for the unit that he occupied during 2021 and 2022. As the court explained, "[f]or purposes of determining net income on [the West Shore Road property], the rental value of the unit Father occupies shall be included at $1200 a month as if paid by a third party." Because father was living for free at a unit that the parties typically rented out, he was benefiting at the expense of lost profits for the parties' joint business. As the court had previously determined that the parties should split the net income for that property, it was reasonable and equitable for the court to assign a rental value to the unit father was occupying and include that in the calculation of total rental income to be divided.

Father also contends that this portion of the court's order was erroneous because it did not provide a specific amount to be paid and required a distribution and valuation of assets beyond the date of the final hearing. He argues that by requiring him to account for and pay mother rental income, instead of estimating a specific amount to be paid, the court contravened applicable case law because it effectively changed the valuation of those rental properties by an amount not yet determined. Father cites to Hayden, 2003 VT 97, for the proposition that "[a]ssets are valued for distribution purposes as of the date of the final hearing, regardless of whether acquired before or after the marriage." Id. ¶ 8. This quote is taken out of context. In Hayden we concluded that the trial court abused its discretion when it used the value of a retirement account at the time the parties separated instead of the value at the time of the final merits hearing. Id. ¶¶ 7-8.

That holding is inapplicable here. First, insofar as the valuations of the Lake Dunmore Road and West Shore Road properties were based in part on their income streams, the valuations reflected the ability of the properties to continue generating rental income in the future. Father points to no evidence in the record that these valuations were somehow equivalent to the current cumulative sum of net rental proceeds for each respective property at the time of trial—indeed, the trial court specifically found that it did not have sufficient evidence to calculate net rental income from 2021 and 2022, which is precisely why the court ordered father to make this accounting. Thus, father has not demonstrated that ordering him to account for and pay mother her share of rental income from 2021 and 2022 effectively changed the appraisal value of those properties or resulted in an unfair windfall. Second, nothing in Hayden suggests that a trial court's property division order must always be distilled to precise dollars and cents. Doing so

6

may not be possible especially where, as here, the parties fail to provide specific evidence of revenue and expenses for their joint business. See Mills v. Mills, 167 Vt. 567, 568 (1997) (mem.) ("The court's ability to specify a value is limited by the evidence before it, and it sometimes must use approximations."). Limited by the evidence presented, the court properly exercised its wide discretion to order father to make a relatively simple calculation and then pay mother a specific portion of the resulting sum. Cf. Meyncke v. Meyncke, 2013 VT 82, ¶¶ 17-19 194 Vt. 556 (affirming divorce order that awarded wife fifty percent of husband's accounts including appreciation or depreciation occurring after date of order).

Father additionally argues that the family court abused its discretion in denying his motion to compel mother to produce electronic receipts related to the Inn on the Green, which father had sought in order to determine whether the Inn's expenses were personal or business related. We review discovery rulings for abuse of discretion. Schmitt v. Lalancette, 2003 VT 24, ¶ 9, 175 Vt. 284. Through discovery, father sought and received all of the monthly credit-card statements used in connection with the operation of the Inn from the beginning of 2019 through the fall of 2021. Father then requested production of each underlying receipt for the line items of these statements, and eventually filed a motion to compel this production.

Following a hearing, the court ordered mother to provide all paper receipts in her possession but declined to order the production of electronic receipts, crediting mother's objection that doing so would be unduly burdensome. Because the primary reason father sought these receipts was to explore whether mother's share of the estate should be diminished based on her wrongful dissipation of marital assets, the court looked to the legal standard set forth in Felis v. Felis, 2013 VT 32, 193 Vt. 555. See id. ¶ 20 (holding that "the trial court could return the disputed assets to the marital estate for purposes of equitable distribution if it found the expenditures involved financial misconduct, such as intentional waste or selfish financial impropriety, coupled with a purpose unrelated to the marriage").[2] The family court noted that both parties had admitted to intermingling personal and business expenses on credit card accounts, which on its own, is not necessarily financial misconduct or unrelated to the marriage. It reasoned that if there was some level of "intentional waste or selfish financial impropriety, coupled with a purpose unrelated to the marriage," the credit card statements would have provided at least some indication of such behavior. It found that father had not made such a showing to justify the additional effort of producing individual electronic receipts to reveal further details of the Inn's expenses.

On appeal, father argues that Felis establishes a burden to be met at trial, not a burden for allowing discovery, so the court erred by relying on it. We disagree. The court did not fault father for failing to meet the standard set forth in Felis; it simply referred to the principles in Felis to guide its exercise of discretion. Because the underlying subject matter—dissipation of

---

[2] Father argues that this case was inapplicable because he sought the receipts not only to show financial misconduct but also to allow for an accounting for tax purposes. Father cites to no portion of the record related to discovery where he presented this latter reason to the family court. See State v. Ben-Mont Corp., 163 Vt. 53, 61 (1994) ("To properly preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it."). Because he failed to preserve this issue, he cannot now claim for the first time that the trial court erred by not addressing it.

financial assets in connection with a divorce—was the same, it was entirely appropriate for the court to look to Felis.[3]  Father argues that these electronic receipts were potentially relevant to properly apportioning the marital estate, and therefore they were discoverable.  But the scope of discovery incorporates a balance of burdens and benefits, and here, the court appropriately exercised its discretion to determine that the burden of finding and producing these records outweighed their possible benefit to the case.  See V.R.C.P. 26(b)(1) (determining scope of discovery requires considering "whether the burden or expense of the proposed discovery outweighs its likely benefit").

Father also cites to his forensic accounting expert's report and affidavit to attempt to demonstrate suspicious purchases on the Inn's credit card statements that would justify further discovery of receipts.  But this report and affidavit were submitted well after the court's discovery ruling and were not part of any motion practice related to the discovery issue.  Thus, to the extent father is arguing that the court erred by overlooking his expert's opinion in its discovery ruling, we reject the contention as unpreserved.  Ben-Mont Corp., 163 Vt. at 61. Because there was a "reasonable basis" in fact and law for the court's decision on father's motion to compel, we uphold that ruling.  Pcolar v. Casella Waste Sys., Inc., 2012 VT 58, ¶ 11, 192 Vt. 343 (explaining that discretionary discovery rulings "are not subject to review if there is a reasonable basis for the court's action" (quotation omitted)).  Given this conclusion, we do not reach father's arguments as to how he was prejudiced by this discovery ruling.

Father also suggests that the court did not adequately explain or otherwise erred in its apportionment of tax burdens between the parties.  Father does not identify specifically how the court erred and does not cite any legal authority for support.  We therefore reject the arguments as inadequately briefed.  See V.R.A.P. 28(a) (requiring appellant's brief to contain specific claims of error and citations to authorities, statutes and parts of record relied on); Johnson v. Johnson, 158 Vt. 160, 164 n.* (1992) (stating that Court will not address contentions that fail to meet standards of V.R.A.P. 28(a)).  We note, however, that the court generally treated the parties' tax liabilities the same way it treated their assets—seeking to divide them as equally as possible, consistent with its conclusion that equity required a relatively even split of the marital estate.  We see no error in this approach.

Father asserts that the trial court should have ordered mother to indemnify father or hold him harmless with respect to tax filings for the Inn, in case it is later determined that mother fraudulently classified personal expenses as business expenses.  This argument makes little sense given that the court explicitly found, as noted above, that neither party had proved "to any degree of likelihood that the other party has hidden or diverted funds."  Moreover, father cites no legal authority in support of the proposition that the family court could or should have issued an indemnification order under these circumstances.  We therefore reject father's argument.

Finally, we agree with both parties that the court violated 15 V.S.A. § 665(a) in awarding shared PRR.  "When the parents cannot agree to divide or share parental rights and

_____

[3]  Father also suggests that the court erred in denying his motion to compel because it relied on a conclusion that the electronic receipts would be inadmissible at trial, contravening the standard of Civil Rule 26(b)(1).  The court did not make any such conclusion regarding admissibility in its discovery ruling.

responsibilities, the court shall award parental rights and responsibilities primarily or solely to one parent." 15 V.S.A. § 665(a). "[T]he court does not have authority to order [shared PRR] absent the consent of the parents." Cabot v. Cabot, 166 Vt. 485, 493 (1997). As we explained in Cabot, parents who do agree to share PRR are statutorily required "to complete an agreement that addresses, among other things, procedures for communicating about the child's welfare and for resolving disputes." Id. at 494. The parties in this case made only a temporary agreement to share PRR while the divorce proceedings were pending. At the time of trial, both sought sole PRR and did not mutually consent to share PRR on a permanent basis. The court therefore erred by permanently ordering the parties to share PRR. On remand, the court shall revise this portion of its final order consistent with applicable law.

The portion of the court's final divorce order regarding shared parental rights and responsibilities is reversed and remanded. The final divorce order is otherwise affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Karen R. Carroll, Associate Justice